**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 1:21-cr-519 (TFH)** |
| **v.** | : | |
| | : | |
| **STEVEN C. BILLINGSLEY,** | : | |
| | : | |
| **Defendant** | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant Steven C. Billingsley to 6 months of incarceration, 60 hours of community service, 1 year of supervised release, and $500 in restitution.

## I.  Introduction

Defendant, Steven C. Billingsley, a 46-year-old truck driver, participated in the January 6, 2021, attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.8 million dollars' in losses.[1]

---

[1] Although the Statement of Offense in this matter, filed on August 15, 2022, (ECF No. 44 at ¶ 6) reflects a sum of more than $2.7 million dollars for repairs, as of October 17, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,881,360.20. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

Defendant Billingsley pleaded guilty to one count of violating Title 18 U.S.C. § 1752(a)(2), Disorderly and Disruptive Conduct in a Restricted Building or Grounds. As explained herein, a sentence of incarceration is appropriate in this case because Billingsley: (1)  recorded and posted to Facebook a series of first-person videos and audio depicting him in an array of disruptive conduct on Capitol grounds; (2) taunted, yelled at, and ignored directions from police officers; (3) encouraged and assisted other rioters in breaching the Capitol grounds, including by unhooking a metal barricade and letting himself and other rioters through;  (4) engaged in violent rhetoric; and (5) has expressed no remorse for his actions.

The Court must also consider that the defendant's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm police, breach the Capitol, and disrupt the proceedings. But for Billingsley's actions alongside so many others, the riot likely would have failed. Here, the defendant's participation in a riot that succeeded in halting the Congressional certification combined with Billingsley's celebration of his disruptive behavior in videos on Facebook, his encouragement of and assistance to other rioters, including by unhooking a metal barricade, his taunting of and disregarding orders from police officers, and his endorsement of violence render a jail sentence both necessary and appropriate in this case.

## II.    Factual and Procedural Background

*The January 6, 2021, Attack on the Capitol*

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 44 (Statement of Offense), at 1-7.

*Defendant Billingsley's Role in the January 6, 2021, Attack on the Capitol*

Periodically on January 6, 2021, Billingsley posted videos of what was going on in and around the Capitol area during the riot.  Most of the videos are of him narrating while one can hear his voice but cannot see his face.  At one point however, in response to a woman who said, "turn the camera around," Billingsley did so.



In a foreshadowing of what was to come, he narrated "I'm going to stop this video now. We'll get another one to you later."

Based on Billingsley's Facebook posts, it appears he was on restricted Capitol grounds from approximately 1:17 p.m. until at least 2:30 p.m.  At 12:52 p.m., he posted "I'm not at capital." A minute later he posted "On lawn now this is great."  At 1:17 p.m. he posted a video in which he is walking toward the Capitol from the west. As Billingsley made his way onto restricted Capitol grounds, he said, "We're past the barricades," immediately after the video showed him walking over a metal barricade and passing other barricades that had been moved by other rioters.



He walked over the barricade as he entered the Capitol grounds adjacent to the Peace Monument and Peace Circle at 1st Street, N.W.  As he stepped over metal barricades lying on the ground, he stated, "This is where they had it closed off.  We're going past it."

As Billingsley walked further on the grounds, he said, "We're going as far as we can get."  When he neared a second barricaded, canopied entry point on the grounds closer to the Capitol building, he shouted in the direction of police officers standing guard there, "We're going through that barricade.  Fuck you people, this is our house."  He continued shouting at the officers, "We're going through.  We can do it the nice way or the hard way. . . .  You guys turned on us."  As Billingsley talked with others who had gathered near the canopy, he stated, "Who cares about them cops?  We overpower them."  He screamed at the cops, "We're gonna walk right in there.  Go get your little bicycles."  He told another person, "If they contest one state, we're tearing this motherfucker down."

At approximately 1:58 p.m., U.S. Capitol Police video showed Billingsley on the north-east (Senate) side of the Capitol. On the perimeter of the East Front plaza adjacent to the Capitol's Senate Wing, Billingsley recorded a video in which he narrated, "They're still

breaching it.  We've come around here, they're just tearing all their barricades down."  He then

told another person, "Well, move it out of the way," and assisted at least one other individual

with undoing a metal barricade, which Billingsley then breached to enter the plaza.  This was at

least the third time he breached a barricade.

As Billingsley neared the plaza area in front of the Capitol's Rotunda Doors, he again

stated, "We're gonna tear this motherfucker down."  He repeatedly screamed, "Push!" at other

rioters who were well in front of him and confronting a line of police officers, and banged on a

black Suburban vehicle, which he called a "Secret Service vehicle."  The vehicle was in fact a

government vehicle. In another video, he narrated, "We're trying to break the breach," and

encouraged others in front of him, "They're getting up there!  Go!  Push!  Push!"

At approximately 2:27 p.m., U.S. Capitol Police video shows Billingsley exiting off

camera heading east after he has just walked down the east stairs of the House of Representatives

area outside of the Capitol building.

At approximately 2:30 p.m., Billingsley posted on Facebook "I'm at door of house."

Billingsley advanced up the steps in front of the Rotunda Doors at the Capitol's East Front.  In

another video, he narrated, "We're up the steps.  We're pushing 'em back.  We're at the top,

ya'll. . . .  I'm going to the fucking top. . . .  We're taking the House."  The video appears to

show Billingsley made it to within approximately 20 feet of the Rotunda doors, but does not

show him entering the Capitol.

While still on the East Front plaza and within the restricted area, Billingsley stated,

"We're not done.  This is just a warning to them."  He and others discussed seeing Members of

Congress looking out from the Capitol's windows.  One person remarked, "We don't want to

hurt 'em."  Billingsley responded, "No, we *do* want to hurt Pelosi.  I do.  Yeah, I would hang her

from that big– you see that tree over there?  We'd put a rope and hang her.  We hang her and Schumer over there, they'll all go, 'Oh, shit.'" As he said "you see that tree over there. . ." he turned the camera towards the tree.



At approximately 3:11 p.m., Billingsley posted on Facebook "We are in union Station but we are going back."  As discussed below, Billingsley later admitted during a post-arrest statement that he and his wife left Union Station and did in fact return to the Capitol grounds for a second time that afternoon.

*Billingsley's Post-Arrest Interview with the FBI*

Billingsley was arrested at his home in Ohio on August 13, 2021. The nearest magistrate was in Wheeling, West Virginia.  While Billingsley was transported, he was advised of his *Miranda* rights, waived those rights, and gave a statement to the arresting agent.

Billingsley advised the arresting agent that he and his wife drove to Washington, D.C. after they talked about attending President Trump's rally with a friend of his. Prior to going to

Washington, the friend said something about storming the steps. He might have said storm the Capitol.

Billingsley believed he did not do anything wrong. He asked, "isn't it (the Capitol) like everyone's house?" He went there marching side by side with his wife. He told the agent he had bigger fish to fry than someone walking across the lawn. He added, "this is a joke, and the joke's on me." When Billingsley got to the Capitol after attending President Trump's rally, it had already been breached. People had supplies to cut the fencing. Billingsley's impression was they were going inside so they could be heard. When a flash bang went off, his wife said, "let's get back" and they retreated from near the Capitol building and went out to the grass.

At some point Billingsley' wife had to go the bathroom and they left the Capitol area to go to Union Station. Then his "adrenaline said, 'let's go'" and they went back to the Capitol grounds. He said they went back to their hotel room at around 4:00 or 5:00 p.m.

During the interview, Billingsley said "do I get loud and obnoxious? Yeah, but I didn't go out there to break the law. I just thought it was our right to do." He also admitted to pushing barricades at a previous rally.

Billingsley said he couldn't believe the government was wasting tax money investigating him. "I didn't go inside. They won't get me. . .the only thing I did was cross the grounds." He also admitted unlocking a barricade and letting himself and others through. He admitted a lot of "stuff" went through his head that day that he knew was not right. For example, he knew the barricade was there for a reason. He knew he should not have gone past the barricades. He felt bad for yelling at the police that day. If he could go back and apologize to the police, he *probably* (emphasis added) would but he did not know who they were. He felt like "getting stuck with some

of this is unfair." "Did we make mistakes that day, yes, but we shouldn't be spending taxpayer money."

*Billingsley's Cellphone Contents*

Law enforcement officials conducted a warranted seizure and search of Billingsley's mobile telephone.  The search yielded  a number of text messages he sent on January 6, 2021 and in the following days, describing his planning, thoughts, and accounts of his activities[2].

| | |
|---|---|
| January 6, 2021 1:10:36 pm | "we breached the house. Got senators hiding under their chairs." |
| January 6, 2021 1:29:24 pm | [He receives a text asking if he was in Washington today. He responds] "Yes. I'm fighting cops" |
| January 6, 2021 1:45:47 pm | [He receives a text saying "Pence is wimpping   out   on   trump."   He responds] "Lol I'm going in lol" |
| January 10, 2021 5:22:36 pm | "We  had  in  planned  for  weeks  to storm the capital and get up steps. Never no talk of breaking in or tearing shit up." |
| January 10, 2021 8:54:39 pm | "I believe its over. I know we was cheated. I was in dc day of the breach to the capital.  Ill never call it a riot. It was no riot lol" |
| January 10, 2021 9:33:20 pm | "I never went in. Wanted to but when they went in. Jamie had go potty. Thats why I never went in. Thank God she had to puss or I would of been in there. Did you see all my videos." |
| January 10, 2021 9:38:03 pm | "I was all the way to the windows lol" |

---

[2] There are misspellings and grammatical errors in the texts. They are set forth here as they appear in his phone records.

> January 13, 2021 11:15:42 pm "What gets me, we speak up to defend this country one time. Urs the end of the world it domestic terrorism. But all these other cities they say was peaceful. I agree people thst caused damage need to be arrested.  But its okay for kamala to have a go fund me to bail put antifa and blm. It so confusing to me honestly. I dont regret anything I did. Maybe my mouth a lil lol. But I never vandalized or put any law in harms way. If they punish this crown then other crowds should be punished also."

### *The Charges and Plea Agreement*

On August 12, 2021, the United States charged Steven C. Billingsley by criminal complaint with violating 18 U.S.C. §§ 1752(a)(1) and (a)(2). On August 13, 2021, law enforcement officers arrested him at his home in Ohio. On August 16, 2021, the United States charged Billingsley by a two-count Information with violating 18 U.S.C. §§ 1752(a)(1) and (a)(2). On February 25, 2022, a Superseding Information was filed that contained the same charges as the Information but did not include the language that the Vice President-elect was at the United States Capitol. On August 15, 2022, pursuant to a plea agreement, Billingsley pled guilty to Count Two of the Superseding Information, charging him with a violation of 18 U.S.C. § 1752(a)(2). By plea agreement, Defendant agreed to pay $500 in restitution to the Architect of the Capitol.

### III.    Statutory Penalties

Billingsley now faces a sentencing on a single count of violating 18 U.S.C. § 1752(a)(2). As noted by the plea agreement and the U.S. Probation Office, he faces up to one year of imprisonment and a fine of up to $100,000. He must also pay restitution under the terms of his

plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

## The Sentencing Guidelines and Guidelines Analysis

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

The government agrees with the Sentencing Guidelines calculation set forth in the PSR. According to the PSR, the U.S. Probation Office calculated Billingsley's adjusted offense level under the Sentencing Guidelines as follows:

| | |
|---|---|
| Base Offense Level (U.S.S.G. §2A2.4) | 10 |
| Acceptance of Responsibility (USSG §3E1.1(a)) | -2 |
| Total Adjusted Offense Level | 8 |

*See* PSR at ¶¶ 30-38. The parties adopted that Guidelines calculation in the plea agreement.  ECF 43, ¶ 5.A.

The U.S. Probation Office calculated Billingsley's criminal history as a category I. PSR at ¶ 42. Accordingly, the U.S. Probation Office calculated Billingsley's total adjusted offense level, after acceptance, at 8, and his corresponding Guidelines imprisonment range at 0-6 months. PSR at ¶ 83. Billingsley's plea agreement contains an agreed-upon Guidelines' calculation designating his criminal history category as II.  ECF 43, ¶ 5.B.However, a review of the PSR shows that all

but six days of his prior sentence was suspended. Accordingly, the U.S. Probation Office's calculation is correct[3].

Here, while the Court must consider the § 3553(a) factors to fashion a just and appropriate sentence, the Guidelines unquestionably provide the most helpful benchmark. As this Court knows, the government has charged a considerable number of persons with crimes based on the January 6 riot. This includes hundreds of felonies and misdemeanors that will be subjected to Guidelines analysis. In order to reflect Congress's will—the same Congress that served as a backdrop to this criminal incursion—the Guidelines are a powerful driver of consistency and fairness.

## IV.    Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6). In this case, as described below, the Section 3553(a) factors weigh in favor of 6 months' incarceration, 60 hours of community service, 1 year of supervised release, and $500 in restitution.

---

[3] The plea agreement acknowledged that the defendant's criminal history calculation could change and allows the parties to argue for a different criminal history category.  "Your client acknowledges that after the pre-sentence investigation by the United States Probation Office, a different conclusion regarding your client's criminal convictions and/or criminal history points may be reached and your client's criminal history points may increase or decrease." Plea Agreement, p. 3.  "However, the parties are free to argue for a Criminal History Category different from that estimated above in subsection B."  Plea Agreement, p. 4.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing Billingsley's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors. Notably, for a misdemeanor defendant like Billingsley, the absence of violent or destructive acts is not a mitigating factor. Had Billingsley engaged in such conduct, he would have faced additional criminal charges.

One of the most important factors in Billingsley's case was the brazenness of his actions on January 6, 2021. He went to Washington, after planning weeks in advance, to "storm the capital and get up [the] steps." He approached a barricaded area, walked over downed barricades, assisted other rioters in physically undoing a barricade, and allowed other rioters to enter restricted Capitol grounds. He harassed embattled police officers, shouting,  "We're going through.  We can do it the nice way or the hard way. . . .  You guys turned on us." Several times as the crowds increased in numbers, he yelled "push, push."  He boasted about crossing the barricades on social media. He bragged about being on the Capitol building stairs and "at [the] door of [the] house." He broadcast about wanting to hang Speaker Pelosi and Senator Schumer from a tree in the midst of an ongoing violent riot. He admitted that the only reason he did not unlawfully enter the Capitol building was because his wife had to leave the Capitol grounds to use a restroom. He and his wife left the Capitol ground and then came back. He was illegally on the restricted Capitol grounds for over an hour.

Billingsley's desire to document his involvement was demonstrated not only by posting videos on Facebook during the riot but also with the text messages he sent on January 6 and the days that followed.

Billingsley expressed little remorse for his criminal conduct when he was interviewed by FBI agents more than seven months after January 6.  He claimed to be sorry only for yelling at police officers.  Instead, he claimed that the government's investigation into the riot was a "joke" and a waste of taxpayer money.

Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of incarceration in this matter.

### B.   The History and Characteristics of Billingsley

As set forth in the PSR, Steven Billingsley's criminal history consists of a misdemeanor conviction for Domestic Violence in 2012. ECF 46 ¶ 41. He's had three traffic infractions since that conviction. The PSR did not identify any mental, emotional, physical, or other conditions that would mitigate Billingsley's actions on January 6 and thereafter. The absence of those factors demonstrates a conscious, reasoned man who was willingly disruptive and disorderly in restricted grounds. This factor favors a period of incarceration.

### C.   The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the

presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37). A sentence less than incarceration here would send would-be rioters a message "that you can do what happened on January 6th, you can associate yourself with that behavior and that there's no real consequence, [and] then people will say why not do it again." *United States v. Mariposa Castro*, 1:21-cr-00299 (RBW), Tr. 2/23/2022, at 41-42 (statement of Judge Walton).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President.

The gravity of these offenses demands deterrence. *See United States v. Mariposa Castro*, 1:21-cr-00299 (RBW), Tr. 2/23/2022 at 41-42 ("But the concern I have is what message did you send to others? Because unfortunately there are a lot of people out here who have the same mindset

that existed on January 6th that caused those events to occur. And if people start to get the impression that you can do what happened on January 6th, you can associate yourself with that behavior and that there's no real consequence, then people will say why not do it again."). This was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss). And it is important to convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

The need for specific deterrence in this case is apparent in light of Billingsley's casual disregard for the consequences of his actions and later claims that the United States is wasting taxpayer money by its continued investigation of the rioting that occurred on of January 6. Billingsley contributed to the mob presence, he enticed the crowd several times by directing people to "push, push," he took apart barricades knowing they were there for a reason and assisted other rioters in entering restricted areas of the Capitol grounds, he entered restricted areas himself, he posted a video on Facebook saying he wanted to hang Pelosi from a tree. This conduct and his lack of remorse merit a sentence of incarceration.

## E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as

in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[4] This Court must sentence Billingsley based on his own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot.

Billingsley has pleaded guilty to Count Two of the Superseding Information, charging him with Disorderly and Disruptive Conduct in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(2). This offense is a Class A misdemeanor. 18 U.S.C. § 3559. Accordingly, the sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(6), apply.

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct".  So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); accord United States v. Sanchez, 989 F.3d 523, 540 (7th Cir. 2021). Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Hrg. Tr. at 49 ("as far as disparity goes, … I am being

---

[4] Attached to this supplemental sentencing memorandum is a table providing additional information about the sentences imposed on other Capitol breach defendants.  That table also shows that the requested sentence here would not result in unwarranted sentencing disparities.

asked to give a sentence well within the guideline range, and I intend to give a sentence within the guideline range.") (statement of Judge Chutkan); *cf. United States v. De La Cruz*, 397 F. App'x 676, 678 (2d Cir. 2010) ("a Guidelines sentence can create an unwarranted disparity") (citing *Kimbrough v. United States*, 552 U.S. 85, 91 (2007)).

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).

If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the

seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id.* ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In *United States v. Glen Mitchell Simon*, 1:21-cr-00346 (BAH), the defendant pled guilty to 18 U.S.C. § 1752(a)(2). Similar to Billingsley, Simon, among other things,  (1) took videos of his conduct on January 6, 2021; (2) along with his fellow rioters moved a metal barrier rack (pushing it towards and against a line of officers); (3) yelled at and mocked police officers as they attempted to defend the Capitol building; (4) loudly urged on his fellow rioters (for instance, telling them to put "fear" into the  officers); (5) actively resisted police officers' efforts to clear the Capitol; (6) celebrated the riot (when interviewed by a local newspaper reporter a week afterwards); and (7) had a  conviction (for disorderly conduct/fighting).  Simon, unlike Billingsley, did enter the Capitol building, wore a plated vest, and initially lied to the FBI about the extent of his participation in the events of January 6, 2021.  Accordingly, the government recommended a sentence of 10 months' incarceration and 60 hours of community service for Simon. Chief Judge

Howell sentenced him to 8 months' incarceration, 12 months of supervised release, and imposed a $1,000 fine.

In *United States v. Benjamin Larocca*, 1:21-cr-00317 (TSC), the defendant also pled guilty to violating 18 U.S.C. § 1752(a)(2). Similar to Billingsley, Larocca witnessed pandemonium outside of the Capitol building, posted videos to social media of his disruptive behavior at the Capitol, promoting the riot to his followers as it was happening, and celebrated and bragged about the riot after it occurred. Larocca, unlike Billingsley, did briefly enter the Capitol building (for 13 minutes). But Larocca did not undo any metal barricades to let in other rioters into restricted areas, did not return to the Capitol grounds a second time, and did not discuss hanging members of Congress in the midst of the already violent riot. The government recommended 3 months of incarceration and 12 months of supervised release for Larocca. Judge Chutkin sentenced the defendant to 60 days of incarceration, 12 months of supervised release, a $5,000 fine, and 60 hours of community service. His sentencing guidelines range was, like Billingsley's, 0-6 months. [5]

In *United States v. Baggott*, 1:21-cr-00411 (APM), the defendant pled guilty to 18 U.S.C. 1752(a)(2). Baggot observed chaos outside of the Capitol building, such as the crowd taunting officers, spraying substances at them, and attempting to physically breach the metal barricades that had been set up for the protection of the officers, the Capitol building, and those inside. Baggott himself threw an object towards the officers and when the mob succeeded in breaching the barricades, Baggott was a mere 30 seconds behind the leaders of the pack -- cheering. He was present as rioters smashed through windows and broke open doors to gain entry to the Capitol building and entered himself, via broken open doors within the first minute of the breach. He

---

[5] Larocca's co-defendant Christian Cortez pled guilty to violating 18 U.S.C. § 231(a)(3) and was sentenced to 4 months of incarceration, 36 months of supervised release, 60 hours of community service, and $2,000 in restitution.

continued to the Ohio Clock Corridor, where he was a short hallway and a line of USCP officers away from the main entrance to the Senate. Baggott spent more than 40 minutes inside the Capitol building before grabbing an MPD officer's baton as he and other rioters were removed from the building. The government recommended a sentence in the middle of his 8 to 12-month guidelines range and 12 months of supervised release. Judge Mehta sentenced Baggott to 3 months of incarceration and 12 months of supervised release. [6]

In *United States v. Phillip Bromley*, 1:21-cr-250 (PLF), the defendant berated U.S. Capitol Police officers guarding a door to the Capitol building, then watched as his cousin assaulted one of them. After the officers were driven off, Bromley encouraged and helped his cousin to attempt to breach the unguarded doors. When the doors were later opened, Bromley went inside, where he witnessed the shooting of Ashli Babbitt. When he finally left, Bromley lied about his conduct to his friends and to the government. Bromley pled guilty to 18 U.S.C. 1752(a)(2). The government recommended 12 months incarceration and 12 months of supervised release. Judge Friedman sentenced him to 90 days incarceration, 12 months of supervised release, and a $4,000 fine.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v.*

---

[6] Baggott's co-defendant Stewart Parks is charged with violating 18 U.S.C. §§ 1752(a)(1) and (a)(2), 40 U.S.C. §§ 5104(e)(2)(D) and (G), and 18 U.S.C. § 641.  His case is still pending.

*Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

**V.      Conclusion**

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Defendant to 6 months of incarceration, 60 hours of community service, 1 year of supervised release, and $500 in restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on Billingsley's liberty as a consequence of his behavior, while recognizing his acceptance of responsibility for his crime.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:      /s/ Susan Lehr
SUSAN T. LEHR
Assistant United States Attorney (Detailee)
NE Bar No. 19248
1620 Dodge Street, #1400
Omaha, Nebraska  68102
Office: 402-661-3715
susan.lehr@usdoj.gov

## <u>CERTIFICATE OF SERVICE</u>

On this 29th day of November 2022, a copy of the foregoing was served upon all parties listed on the Electronic Case Filing (ECF) System.

<div style="margin-left: 50%;">

/s/ Susan Lehr
SUSAN T. LEHR
Assistant United States Attorney (Detailee)
NE Bar No. 19248
1620 Dodge Street, #1400
Omaha, Nebraska  68102
Office: 402-661-3715
susan.lehr@usdoj.gov

</div>